Thank you, Your Honor. May it please the Court, Paul Hoffman for the plaintiffs and appellants in this appeal. To start, the statement of interest that the United States government filed, in our view, is not the kind of executive action that would justify the district court in denying a jurisdiction that Congress has given the courts, that jurisdiction coming under the Alien Tort Statute with respect to plaintiffs' federal claims and the jurisdiction to hear state law claims under diversity jurisdiction and also supplemental jurisdiction. And the main basis for that is that there are a couple, really. One is that the statement of interest is a general statement about concerns and policies as a one-off response to the district court's request for the government's views. The government did not insert itself into the case. It was responding to the district court's request. And it's not this kind of statement of interest. In fact, I think if one looked at the statements, for example, in Doe v. Exxon or the apartheid cases, it's far tamer and far more general in many respects than the very specific and lengthier statement, for example, in Doe v. Exxon. To the extent you're addressing the ATS claim, can you explain why the Supreme Court's decision in Kiobel didn't just preclude an ATS claim here, since based on the complaint, all relevant conduct occurred in a foreign jurisdiction? Yes. The reason why Kiobel should not be found to end the ATS claims here is that Kiobel leaves open a number of issues with respect to the kinds of claims that touch and concern the United States. And Kiobel itself came in the context of a foreign cube case. In other words, a case in which all the plaintiffs were aliens living outside the United States when the events occurred. The corporations were foreign corporations. And all the events took place outside the United States. The Supreme Court's ruling didn't seem to turn on that issue. They said where the conduct occurs in a foreign country, no jurisdiction under ATS. I don't think, I mean, with respect, I think that the court has left open that issue. And in particular, I think the court has left open the question about whether U.S. citizen defendants should be treated differently with respect to the touch and concern issue. For example, in the opinion that you wrote in Sarai, you focused on the fact that U.S. citizens might be treated differently. In fact, I think you said there had to be a U.S. nexus for there to be ATS claims. That opinion did not prevail. That's not the law here. But the basis of the opinion actually, I think, is the basis for distinguishing, is the same basis for distinguishing what the court did. Because one of the arguments at the court in Kiobel was about U.S. citizens and about Bradford, the Bradford opinion. And, in fact, the way that Chief Justice Roberts distinguished the Bradford opinion in the context of his discussion about the presumption against extraterritoriality that the court was applying was that there were U.S. citizens involved. And, in fact, this is really a Bradford kind of case in the sense that in the Bradford situation, the attack on Sierra Leone basically had U.S. citizens aiding and abetting or directly participating in an attack on British soil in Sierra Leone. And the Attorney General in 1795 said, of course an ATS claim is available for that. And Chief Justice Roberts said, well, whatever Bradford means with respect to U.S. citizens, that's not this case. But what about Morrison? I mean, Kiobel relies on Morrison. Morrison is a Florida corporation, right? And Morrison just says SEC doesn't apply extraterritorially. You have a chance to explain why the relevant conduct, the focus of the conduct was in the United States, but that nothing turned on the citizenship of the party there, the defendant there. Well, but I think that the court may have cited Morrison as a general framework. But, in fact, if you go back to the history, which you would have to go to to figure out what touch and concern means, you would have to look to see that one of the main concerns that the founders had would be actions by U.S. citizens, wherever they took place, that might actually cause the United States to get into conflict. Is it your position that if it is a U.S. citizen or a domestic corporation, there is no presumption against extraterritorial? Yes, our position is that when U.S. citizens are involved, Kiobel doesn't apply. And that's, of course, the Breyer position. Well, that's part of the Breyer position. And I think that the one – and one of the things that – That wasn't really the Breyer position. That's number two. The defendant is an American national. Well, that's part of his analysis. That's correct. And I think that basically our position is that – I mean, the general position is that Kiobel really has left open many issues. The Second Circuit's original judgment in the ATS case back in Florida, is that threatened by Kiobel? Well, this is another – I mean, for example, the U.S. government brief in Kiobel II made it very clear that Philardia should still be good law. And Philardia, of course – all Philardia cases are extraterritorial in that sense. I mean, all of the events take place in Philardia. Everything took place in Paraguay. The only connection in the United States was that Philardia was now living in the United States. Right, that's correct. And so, you know, there may – so the question then is, is that enough of a nexus? Is it enough of a nexus that in this particular case it was U.S. dollars that paid for the Air Force that bombed this village and committed a war crime? Is it enough of a U.S. nexus that the State Department cut off aid to that particular Air Force unit because it was unhappy about the fact that the Colombian government was not investigating criminal responsibility and that happened? I mean, I think that there – all I'm saying is that I think Kiobel – What would you allege – I guess is the question – what would you allege in the complaint to say that there was sufficient nexus – or I don't think nexus is a word that Kiobel used – that there was a sufficient conduct in the United States to overcome the presumption against extraterritoriality? What would you allege? Putting your briefs was pretty minor. I think the problem that we have on that is that without some jurisdictional – well, it may not be jurisdictional discovery – but without some discovery into the connection between U.S.-based actors and what happened in Colombia, it would be difficult for us to do that at the outset. No, it almost says you don't get discovery. It says it's your obligation to make plausible factual allegations in the complaint. Well, if the – but there could be plausible factual allegations that would lead one to assume that the accidental – from their U.S. operations actually controlled the events in Colombia in the sense that this was not just a one-off event. I mean, the air scan was hired by Occidental to provide security services on an ongoing basis in this area of Colombia, and I think it would be plausible to allege that those responsible in Los Angeles, which is where Occidental is based, were intimately involved in those kinds of arrangements. And do you have facts to allege that, or are you speculating that the mere – it all refers to the mere possibility of misconduct? Well, I don't know that it's a mere possibility. I think that we might be able – I mean, we would need to go through the available information about Occidental's operations and about things from third-party sources to see whether we could do that. And, in fact, it's – in Dover v. Nestle, basically, that's what the panel allowed for on remand, to allow a complaint with whatever further investigation is necessary to meet the new requirements under Kiobel. So you don't have any evidence that you've been able to allege of actions that actually took place in the United States? We haven't, as – obviously, at the time that we prepared this complaint, and up until Kiobel, really, there was no issue about the extraterritorial – And doesn't that bring you back that the only point that you really have that you can allege with any certainty is that Occidental is a U.S. corporation? That brings you back to Justice Breyer's concurrence. But don't you – doesn't your argument really rise or fall on the Breyer concurrence? No. I mean, it doesn't, I think, because I think – and I'm not saying that – I'm not saying that Kiobel decided that our position is correct. What I'm saying is Kiobel left that open. Well, I think he must have opened the Breyer position. It doesn't seem to address that. Well, what I think – but the other parts of it, I think, that I think are important in this analysis, as the Court's coming up with its approach to this, is two things. One is that it's only the Alito concurrence that says that all the actions have to take place on the territory of the United States that create the cause of action. So, in other words, there can be conduct in the United States – and it's not clear what that is from the Kiobel opinion – that would be enough to trigger a touch-and-concern finding based on the Court's analysis. And the Court doesn't say what that is. It just – it's only Alito and Thomas that say that all of the facts comprising the cause of action have to take place on land. What Justice Kennedy has said – and he really, in a sense, hasn't said much in his concurrence. He basically says, number one, this is a very narrow decision. And Justice Alito says it's a very narrow decision, too. And it would be a little odd if the decision is taken as broadly as you suggest. Well, that would wipe out all ATS cases, pretty much, or most of them. And so that would be as broad as you could imagine. So this is a narrow – That's irrelevant conduct happened in the United States. I mean, that is what Kiobel seems to say. Well, but the – And even on this touch-and-concern, I'm looking at the language. Touch-and-concern is not enough. Even where the claims touch-and-concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial applications. So this appears to say that even if you found that some of the claims touched-and-concern the United States, that would be insufficient. Well, I don't – I mean, I think that's one reading of it. I would read it differently. I mean, for example, I would say that if a U.S. citizen had attacked Ambassador Maura Blair, in the current day some other ambassador, outside the territory of the United States, on the territory of another sovereign, and that person came to the United States – sorry – to sue under the Alien Tort Special Act, I think it's unimaginable that the ATS wouldn't apply to that. That's exactly what it was for. And that has nothing to do with extraterritoriality. It has to do with the responsibility of the United States for the actions of its citizens. And in this case, we're talking about a corporation that we claim is responsible for a war crime that the United States acknowledges is a war crime and that Colombia acknowledges is a war crime, and which is not an active state of the Colombian government because the Colombian government has turned its back on it and prosecuted the people with whom the defendants in our case worked with on this project. Let me ask a procedural issue. And that is, in the court below, when the motion was made to dismiss, was the argument made that you had not alleged sufficient facts to state a claim under the Aliens Tort Statute? I'm sure Mr. Collins will correct me if I'm wrong on this. But my recollection, at least, and my understanding is that they did not raise extraterritoriality in the fact that it was extraterritorial in their motion to dismiss. And my understanding from a technical standpoint, based on Morrison in part, is that the question of extraterritoriality or the extraterritorial scope is a 12B6 issue. It's not a 12B1 issue that a court would have to think about. If this court were to conclude that you could sue a domestic corporation in the United States, even if everything happened outside the United States, you could then proceed with that Alien Tort Statute claim. Is that right? That's right. We could. But the other option that's open is the Doe v. Nestle option, which is to send it back, allow us a chance to amend our complaint, and then have the district court decide this question in the first instance. Well, that's why I was asking you what you would allege. Well, part of – I'm sorry, but, you know, at this point I really don't know whether we could meet that. I honestly don't. We have some ideas about where to look, but I can't say before you that we could. Judge Ray also dismissed the claim for cruel and inhuman and degrading treatment under the statute because it had not obtained the status of binding customary international law. Did you appeal that? No. All right. We're not – that's not before the court. The only issues – the only ATS claims before the court are torture, extradition, so killing, war crimes, and crimes against humanity. And I think with respect to that, it seems best that both before and after SOSA, those are the kinds of claims that have always been accepted under the Alien Tort Statute. Are there – should I – would it make sense for me to go back to political – I'd like to just go back to the beginning, and that is the jurisdiction of this court to hear this claim because the question has been raised as to whether or not your appeal was timely. Right. I understand that. Well, my – our understanding and what I think the only reasonable way to look at what happened here is that the first panel after argument sent it back for a limited remand to Judge Wu on the question of whether exhaustion was required. It didn't say a limited remand in its order, did it? Well, the order said this is the issue that you should consider. And the thing is, if that wasn't the case, then what that would mean is that as soon as the case came back, we had to file a notice of appeal even before Judge Wu decided that question. And I think if you look at the cases that the defendants have cited, they really aren't on point with respect to this fairly unique situation. And, you know, it seems – Your claim is that your original notice of appeal is still valid. That's right. The curious thing is that the court docketed this under – put it under a new docket number instead of the original docket number and made you topside brief, although you filed a cross-appeal here. Well, it's a little – that's a little confusing in the sense, number one, I was certainly surprised that we had to kill more trees to put another copy of all the excerpts in that we had put in before. But the court clerk told us to do that, so we did that. In terms of the briefing schedule, that was negotiated between Mr. Collins and I. I mean, our position originally was, hey, it's your appeal. You lost in front of Judge Wu. You should do the first brief. Oh, well, no, you should. You should because you've got all the insight. And I said, okay, we'll do the first brief. I mean, it wasn't – we didn't talk about it from the standpoint of the significance of that. It was just about what made the most sense to put the issues before the court. The district court's docket actually lists the Wu opinion and says final judgment. You know, I don't understand what that would – I mean, we had lost already on political question and foreign affairs grounds. I mean, I don't think we could have lost any worse than we lost double. The Ninth Circuit panel didn't – this is what was – it was a very confusing sequence of events. But the Ninth Circuit panel did not expressly rule on Judge Rea's dismissal. But in order to remand on – you know, if we go into this alternative view, in order to remand on prudential question, they must have rejected Judge Rea's determination and not found any other basis to uphold it. And therefore, I suppose we could take the Ninth Circuit panel's conclusion as reversing Judge Rea's determination and saying there's only one basis in which you could avoid the dismissal, and that's on prudential exhaustion. Is that correct? Because the Ninth Circuit panel did not rule on the merits of the appeal, correct? No. We had an argument. But after the argument, we got this order. And the parties – I mean, if you read – when you read Judge Wu's decision, it's actually kind of funny, because he starts out by saying, well, I don't know what I'm doing here, because the court's already decided there's no jurisdiction, and that hasn't been modified, so how do I have jurisdiction to do anything? And then I think he cites Tennyson about, you know, who are we to question and just go forward. And that's basically what we did. I mean, I think the parties and Judge Wu had absolutely no idea what was going on, other than the Ninth Circuit panel had said, would you consider this issue and send it back up? What do we do with Judge Wu's – he went on to do more than perhaps he was asked to do, but, of course, there was great uncertainty on what he was supposed to do. But he does reach a different opinion on comedy and forum nonconvenience, I believe, than Judge Wray. How do we sort that out? Do we ignore it? Do we decide which one we like best? How does that play out here? I prefer ignoring on those issues. But, you know, it's hard to say. I mean, I think that Judge Wray made a decision based on the information in front of him, based on what he was deciding. I think he did a very thorough job of going through all the factors on those doctrines, and he came to his conclusions. Judge Wu is deciding a different kind of question, and one of the reasons we say that the other part is dicta is that he was really – that once he decided that there was no prudential exhaustion, the rest of it was just his views on the evidence before him, which we think, at least with respect to the safety issue, were completely wrong. And I know that the – and just since I'm at that point, the defense – the accidentalists complained that we didn't distinguish the Argetta case, which also Judge Wu relies on for the proposition that you don't have to actually be at the trial to have an adequate forum. And I would just say that that's a completely distinguishable case. I mean, Argetta is about the enforcement of a forum selection clause in a loan – in two commercial loan agreements where the plaintiff is trying to get out of going to Mexico to litigate his case  and has the burden under the law of trying to get out from under the forum selection clause. That's not – Here's one of the things that bothers – that's troublesome about this case, and I understand that often with these ATS cases they just get dragged out for years and years and years, and, you know, that's hard for everybody. But it turns out that sort of the parade of horribles that your expert witness raised about the opportunity for remedies in Colombia turns out to be wrong. It turns out that the Colombian government was quite capable of dealing with this, that it dealt very harshly with the officers, that it awarded damages to your clients, and it looks like Colombia actually turned out to be a viable forum. So why at this point shouldn't we hold that there is an alternative forum in Colombia and there's a lot of noise that would accompany a trial in the United States? Well, first of all, I think that there's substantial evidence in the record, which I think Judge Ray recognized, although he recognized it under the private factors under forum nonconvenience, that our clients can't safely go back to Colombia. They have asylum in Canada. They have been subject to – But they got released. Well, they did, but they did without participating after they were threatened and left. And I don't know that the amounts – there was a settlement after there was an administrative proceeding, and our position, supported by our experts, is that that's not complete recovery, and it's not recovery at all against the defendant corporations. They have not been held accountable. And even if it was only a dollar that we got, we still want to hold them accountable for their role in it. Right, but this suggests that Colombia had a forum in which you could have brought them, just as you brought the Colombian government or officers of the Colombian government. Well, we didn't bring – I mean, it's the government that prosecuted the officers. The criminal case, yes, but it indicates that Colombia was a forum in which to air these complaints about the conduct of Colombian officers. But there was a civil suit and a $700,000 settlement there. That's for everybody, not just our clients. Right, but – They did enter into the settlement, right? They did, yeah. No, in fact, I mean, we understand that – You may want a dollar from Occidental in order to hold them to a symbolic recovery, but you had an opportunity to bring them into the suit in Colombia. That's debated. I mean, our expert says that we didn't in that proceeding, and that it's too – and that it would have been too dangerous to bring a separate case against them because it would have to have been brought in Aruca, which is one of the most dangerous parts of the country, where our clients would have been – and witnesses and possibly a lawyer may have been killed if they did it. And there's substantial evidence in the record about that, about that part of the country, Amnesty International reports, State Department country reports, expert testimony, our clients' experience where his colleague in the case was assassinated in his house. Can you answer the procedural issue, though, with the Colombia litigation and the settlement? Right. I mean, the opposing counsel and their expert reference principles of joint and federal liability, which also appeared in your brief as an argument that the corporations were jointly and federally liable, and the principles of ours against double recovery, which is certainly a statewide and elsewhere principle. And so the argument is the recovery in Colombia was – even if it wasn't as much as you could get in American courts, which in our case law doesn't care, at least for foreign non-convenience purposes, was jointly and federally here against one of the joint tort feasors, and double recovery is barred. And those principles seem to be congruent with American principles, so it wasn't clear to me what the basis would be that you get to pursue a joint tort feasor for double recovery in the United States. Well, just as in the United States, if you settle with one joint tort feasor and you don't get complete recovery, you are able to go after the other tort feasor for the rest of the recovery. That's our position. I think our position is that whatever recovery we got here would obviously – you'd have to take off the amount that we've already got. And that's true here. And our cases say as long as you get some recovery, you're not entitled to another series of litigation. What's wrong with that analysis? Well, I think that as we see it, the way that would come up is if the case was remanded for further proceedings in front of the district court, presumably accidental, would interpose as a defense, that it would be double recovery for us to get anything else based on the proceedings before. And then the court would have to decide. First of all, I guess they'd have to make a choice of law analysis, but assuming they decided that Colombian law applied and that it was appropriate, usually they'd have to decide if it was double recovery, and they'd have to decide whether the settlement is different from a judgment, for example, or a judgment affirmed on appeal. There are differences of opinion between the experts that Occidental has put before the court and our experts about what would happen in that situation. And I'm not actually even sure that the experts have completely covered the question about the effect of the settlement. But actually, I think they probably have because they did it in front of Judge Wilk afterwards. So there's a difference of opinion there, and I think that's the kind of thing that judges do all the time. I mean, in international cases, judges figure out what law to apply and whether it's appropriate to apply it. What's the standard of review here? Is it abuse of discretion? Well, I think it's abuse of discretion with respect to the discretionary deferral doctrines, with respect to international comedy, forum nonconvenience, and prudential exhaustion. But the problem we have here is that we've got two different views from the district court. We've got Judge Ray and we've got Judge Wu. But I don't think – Sorry. Do we just look at Judge Ray's opinions on abuse of discretion and ignore Judge Wu? Do we look at it de novo because we have this conflict? I think that because what's being appealed from is the denial of the forum nonconvenience defense by Judge Ray. That's what you look at. That's what the abuse of discretion standard applies to. I think it's also possible that if the case went back down that there would be additional motions. You know, this goes to the question of how long it's taken. I mean, the State Department last expressed views on this in December of 2004. The Colombian government in early 2004. There's been a proceeding in Colombian courts, a settlement. A judge was killed in Aroca 2011, which would help us. The Colombian government has acceded to the Hague Convention. In other words, the landscape in the last nine years has changed on a number of these issues, and it's possible that there would be additional motions based on the current state of affairs. The Department of Justice filed an amicus brief in the last proceeding before this court and argued that the case ought to be dismissed on the basis of comedy. Has anything changed about the nature of the doctrine of comedy since DOJ filed those views? I don't think markedly. I mean, one of the problems, and I think with respect to the Justice Department's submission, I think on those issues it's not entitled to deference in the sense that they were filing an amicus brief on legal issues. They were not filing an amicus brief. On the question of comedy, in order for a court to dismiss something on the basis of comedy, must it find that there's a conflict between foreign law and U.S. law? Well, there has to be a true conflict, as that term is understood in Hartford and in Ray Simon. Hartford was a slightly different situation. In both of those cases, there was a determination that the law at issue applied extraterritorially, and it was prospective relief. In other words, should we reach out and prevent and apply our law to prevent cases in other countries? It didn't seem to me that under those circumstances here we don't have a determination that the law applies extraterritorially. So it wasn't clear to me that that requirement was applicable here. Because we have other international comedy cases, which say, like Hilton, starting with Hilton, which say it's a form of abstention. And then in the Vanage case, when we do it retrospectively, we apply different rules, it's a form of abstention where in a foreign country a determination has been made, a case has been determined, then we will abstain from relitigating it. But I think there has to be a conflict with something. And Ongaro is a good example of this. In Ongaro, there was a true conflict. I mean, whatever they said about prospective, there was a conflict. Ongaro is one of the Holocaust cases. And in the Holocaust cases, the conflict was between the rights to litigate that people had and the foundation. And here we have the same conflict, in a sense, in that there was already a mechanism set up to decide the case. It decided the case. It decided that issue. So I guess this seems to me very analogous to the Vanage case. But I don't think this circuit has ever accepted prospective international comedy in the way that the defendants have argued it, which winds up being a kind of way around forum nonconvenience. Because basically the conflict is there's a country over here, and there's our country, and there are two possibilities for litigation. The question about whether the plaintiff's preference to litigate here gets wins or it goes to Columbia is under the forum nonconvenience doctrine. It's not under international comedy where you just balance. The doctrines do appear to overlap quite a bit. Obviously, a lot of these doctrines are based on some general sense of international comedy, right? I mean, even the exhaustion, prudential exhaustion, comes from that place. But, I mean, one of the things I'd argue on prudential exhaustion is that, in a sense, the Kiobel decision may have superseded the idea of prudential exhaustion in eliminating certain foreign-queued cases, which were the ones that were causing the court to think about exhaustion. In fact, in the Kiobel argument and in the briefing, the U.K. and the Netherlands and the European Union argued for exhaustion as the way to deal with the problem that was before the court, and it was the decision by the court to come up with this other mechanism to deal with that problem. What are the true conflicts that you see that would preclude us from saying, abstaining in this case and saying that there is an alternative forum and that essentially everything happened in that forum, why shouldn't the litigation proceed there, if at all? Well, I think that the obstacle to that is that Judge Ray undertook the detailed forum nonconvenience analysis, and he considered all of the factors that you're supposed to consider under the rules set forth by this court. And he came and he decided in his discretion that we had the right to pursue remedies that we have available to us. Can I ask you about Judge Ray's conclusion? Yes. So he said, no, there wasn't a valid alternative forum in Columbia, but he based it on this double recovery rule, which may or may not have been corrected as a matter of law. But it seems to me that had the panel, had the Ninth Circuit panel accepted that ruling, that there was not an available alternative forum, I don't know how they could have sent it back on prudential exhaustion grounds, because if you don't have an alternative forum, then clearly there can be no requirement to exhaust. So I can't believe, or I can't see how we can infer that the panel accepted Judge Ray's ruling. It must have sent it back to Judge Wu to make additional findings, which it did. It seems to me those are the findings that are binding on it. I don't, I would disagree, because I think that the Ninth Circuit panel sent it back with specific instructions to consider prudential exhaustion. There has to be prudential exhaustion at all if you can't go to the forum to exhaust. I mean, there's no way you could accept the ruling that it's not an available forum and then send it back on prudential exhaustion. That's just completely inconsistent. Well, I mean, it's possible. I mean, the way I. How is it possible? Well, I think, I mean, the only way that I can explain it, and obviously I, you know, what do I know? I think the court did not come up with any decisions. And they wanted information about, so I had come down, and there was a new possibility of another issue on which they could make a decision, and they sent it back down to Judge Wu. But in asking him to look at prudential exhaustion, certainly one element would be, can you go there and argue your case? So I guess that. Not necessarily, because actually. I don't see that. If you can't go there to argue your case, then you can't possibly exhaust. But the panel didn't ask him to do that. Well, we asked him to look at prudential exhaustion, right? Well, but what Judge Wu did, actually, was he said, under the Sarai framework, if there's a U.S. nexus and it's a matter of universal concern, we don't go there. There is no prudential exhaustion under Sarai. It's exactly what Judge Morrow did on remand in Sarai itself. So did we send it back as a futile act because we already were bound by the decision of Judge Ray that it wasn't an available alternative for him? Well, I don't think you've been. I mean, I think that the court insult us here. I don't know if I had difficulty in understanding why he had received it back. Well, we were all scratching our heads about what we were doing. I mean, it was the most unusual order I've ever encountered. And, you know, that but I said not to reason why. So today, Nick's name to the state law claims and the foreign affairs doctrine, which we haven't discussed. Yes. You're suggesting we reverse the dismissal of the state of the common law claims based on the supplemental statement of interest. Why? Well, in a sense, for the same reason as I'm asking you to reverse the political question, in the sense that what the foreign affairs doctrine cases are about are about a conflict. I mean, it's not there's no field preemption problem here. Right. I mean, California has not gone out and tried to create its own foreign policy. These are common law torts. They're not they're generally available. There's no special statute of limitations. California is not trying to develop a Columbia foreign policy deal with field preemption. He didn't. So he based it solely on conflict. He did. So is there a conflict? Well, no. And in the sense that there isn't a conflict from as we see it. I mean, what we think Daramondi in that line of cases requires is more than just a one off statement of interest about the views of the of the state department. In all these cases, in Daramondi and in the other World War two cases, the other Holocaust cases. There's some history of action. I mean, it could be in the form of treaties in a Jew case out of. I think that's how you pronounce it. J.O. and the D.C. Circuit. Or in the case of Daramondi, a different way of dealing with forcing insurers to come up with disclosure than than California. But there's a history, the history of action. It's not just a statement of interest saying we'd like you to dismiss this case because it's easier for us. If we if we allow you to go forward on your common law claims, have you got up? Have you got to fight over conflict of laws ahead of you? Possibly. I mean, I assume that occidental is going to come back and say California doesn't get to extend its tort actions against U.S. corporations operating in on foreign soil. I think they're there. And therefore, you have to apply Colombian law. That's a fair prediction. And it's very possible that Mr. Collins and I will continue to litigate against each other in this and other cases for the rest of our professional. And some of the some of the I was going to say, we wish you many happy years. Fortunately, we've come to like each other. Law claims were dismissed as being time barred. That's right. You appeal that. We didn't know. And but others were not. But so that those issues which were dismissed as being time barred, the California Business and Professional Code claim and claims against one of the plaintiffs as being barred by the statute or not, no longer in the. That's right. I mean, we appealed certain issues and the other ones we understand. We've given up by not appealing. So the statement of interest by the government, how strong would it have to be before you would say it crosses the line and we should apply the doctrine and dismiss those? Well, I would say the minimum the minimum level and whether there's another level is another question has been defined by the government itself. I mean, if you look at Doe versus Exxon, for example, not not the most recent Doe versus Exxon, but the four seventy three Fed third Doe versus Exxon. In that case, the political question motion was denied. Exxon tried to bring a interlocutory appeal. The government came in on the side of the plaintiffs and said, well, you know, we filed a statement of interest. And yes, it's strong and we've got all these concerns about this, that and the other. But there's no jurisdiction in the appellate court, because if we if we want you to dismiss the case, we'll tell you that we want you to dismiss the case. We will say we want you to dismiss the case. We have dire consequences if you don't dismiss the. Well, I think that's what that's what the government said in the Sarai case. Well, the brief the brief. I think that what the government said in its brief in the brief in the insert in Exxon, that was followed by Paul Clement and that time during the Bush administration was, will we know how to tell courts when we really want it to be dismissed? And we have other times when we're just expressing our concerns. And in the Obama administration, just to show that it's been a consistent position in the Ballantulo appeal, the the the solicitor general's office came in and made the same position and supported the plaintiffs. And when when the defendants in the apartheid cases tried to do an interlocutory appeal on the denial of political question in that. And in the apartheid cases, you have even started having footnote 21 and Sosa saying you should give serious weight to this. The district court rejected that based on an analysis of the statement of interest and everything else going on. And and the the state the State Department, notwithstanding its position, came in and said, look, if we want you to dismiss the case, we'll tell you. And we'll tell you when it's when it's so important that that that this should happen. In fact, even in the foundation agreements in the Holocaust cases, even when President Clinton promised Germany and everybody else legal peace, part of that. And I'm not sure it's formally in the executive agreement or otherwise. They said, look, we're going to file statements of interest, but they're not binding on the courts. We can't tell you what the courts are going to do with them. Of course, the courts did. And comedy and in all the other ones on political question decided that they couldn't embarrass the executive having gone out and settled all these claims. And that's not what's happening here. Are you suggesting that any time the government in the statement of interest said the court ought to dismiss the case? Is that enough? I wouldn't say that. Well, it sounds like you just said that. What I'm saying is that it knows how to do it. And if they wanted the court to dismiss, they would ask to have it dismissed. So let's assume that here they've added a little sentence that says, no, by the way, the government wishes the court to dismiss the case. Would that be enough? Well, our position would be there have to be a longer policy. I mean, from a plaintiff's perspective and from the way I see it, I think there has to be more than that. But what the government has said, at least in terms of what it says is what should happen. It has to be more than what you see here, which is really, I think, the key to deciding this case. Whether if the government says, please dismiss, you have to dismiss. I think Baker versus Carr doesn't say that. I think that it's a judicial decision. I suspect that most courts, if the government comes in and says, you know, this is so important that we have to dismiss the case. Probably that's what will happen. On the other hand, in Medellin, the president came in and said, you know, please live up to the Vienna Convention and don't execute this person. And Texas said, you know, we don't have to pay attention to that. And the court said, that's right. And I think that the significance of Medellin, I think, from our standpoint is that in Medellin, the Supreme Court said there are certain areas where the government has a lot of latitude to act and where courts have to steer clear. For example, the settlement of the claims of foreign victims is the one area that they focused on and said, look, the executive's done that for a long time. The Congress has acquiesced in it. You can go back to Danzin Moore and the Iranian claims and all the rest of it, even though that was authorized by statute. But outside of that, even a presidential statement is not going to stop a case because the courts try cases. That's what they do. That's what they're committed to do under the Constitution. Do you think a legal advisor for the State Department is a sufficient statement by the executive branch to call into question this whole issue? Well, you know, I think that what Judge Ray went wrong is that he dismissed the case based on that, I think, believing that he had to. I mean, there's something in the language that almost seems like he can't question it, and he clearly can question it. And he also took it into account in his foreign nonconvenience analysis. He didn't take it into account in the way the defendants would have liked, but he did. He considered it and he thought about it very thoughtfully, we think, within the realm of his discretion. So, you know, from our standpoint, and by the way, as the court in Doe versus Exxon, the second said when they affirmed the denial of political question in that case, basically they had an invitation to the government to say, if you think this is a problem and we really need to dismiss it, tell us. If you tell us, we'll reconsider it. They didn't say, you know, exactly what would happen, but that case is proceeding in the D.C. District Court free from any political question problem. And, you know, one of the things that courts can take into account when they get a statement of interest, as happened by Judge Oberdorfer in the Exxon case, what Judge Oberdorfer did is he not only dismissed certain claims, which have now been sort of overturned, he also fashioned discovery in connection with the government's concerns. So there are reasons why the statement of interest has significance in the litigation other than dismissal or not with respect to political question. I mean, they, you know, certainly we can't question Judge Ray's decision to ask for that guidance, and he used it in, you know, in one way that we think went beyond what he should do, but generally, I mean, there's no reason why a court shouldn't have it. But the underlying point is that we have jurisdiction, we have subject matter jurisdiction on these bases, and then putting aside the debate that we've had about Theobald and the Alien Tort Statute, which is a different question. There was no basis just for the ‑‑ having a situation where a State Department through the Justice Department can just decide that their preference for a case to be decided elsewhere, that that's dispositive, is not a rule that the court should adopt. I don't think it has been adopted anywhere. I think Judge Ray was wrong in doing it. It could come back to haunt not just human rights plans, but anybody. I mean, it could be a contract dispute. What if a future legal advisor says, well, forget those forum clauses in your contracts. We're going to force you oil companies to go litigate your claims in Ecuador or Colombia. I don't think that if that was the case, you could be sure that Mr. Collins would be getting up and saying, well, that doesn't ‑‑ we don't have to have the State Department and the Justice Department telling us whether we can have that or not. And I think that's the same thing here. You can't have a situation where one statement of interest, which is not connected to an attempt to settle the victim's claims or anything like that, because there's never been any effort by this government to try to get relief for our clients or accountability from the defendants. Maybe I should ‑‑ I think we've got the argument. I don't think we have further questions for you now. I think we probably will. And I am going to allow you time for rebuttal. Okay. Thank you very much. Good morning, Your Honors. May it please the Court, Daniel Collins, Munger, Tolson, Olson. I'd like to begin first with the issue of political question and comity. They sort of ‑‑ you see the interplay between those two doctrines in the Ungaro-Bonage's case in the 11th Circuit and the Whiteman case in the 2nd Circuit, which essentially confronted with the same essential situation, used different doctrinal boxes for that. And the district court here, we think, correctly used the fifth Baker test, which was the approach taken in the Whiteman case. But alternatively, as in the Ungaro-Bonage's cases, it could be done under comity principles, which is also the position that the United States took on the prior appeal in this court, that comity was an appropriate box in which to place the doctrine. Now, with respect to the policy that is stated in the Statement of Interest, it's not true that this is sort of a ticket for this train only, a one‑off, as counsel referred to it as. And the Whiteman case makes clear that the fact that there is a Statement of Interest that says how the policy of the United States applies in the specific case is a factor in favor of applying these doctrines, not something against it. But if you look at the Statement of Interest, it makes clear that this is not a one‑off. The Whiteman case is fairly distinguishable, is it not? I mean, there was an executive agreement to resolve claims set up by this alternative forum. I mean, that's totally different, is it not, from this kind of case? It certainly has the additional feature that, with respect to Germany, there was an agreement to set up a foundation. Now, I would note, however, and some of these cases spill over from the comity and political question context into the foreign affairs doctrine. If you look at the Ossie Carrazioni case, for example, in the Second Circuit, they pointed out that in that case and also in the Garamendi case, the Italian entities were covered, even though there was no agreement with Italy. There were only agreements in Garamendi with Austria, France, and Germany. The whole point is that the government's policy is to point to another forum. It's not how the forum was created. Was it created by an agreement? It's to point to another forum, and that brings this case exactly within Whiteman, with Ungaro-Banaghes, and into the Ossie Carrazioni case with respect to the foreign affairs doctrine, because that's what the government's policy was here, and it identified two specific, broader-ranging policies that then discussed how they applied in the specific facts of this case. And if you look at excerpts of Record 410, which is where the statement of interest is, it identifies first the longstanding U.S. policy. An important part of that foreign policy is to encourage other countries to establish responsible legal mechanisms for addressing and resolving human rights abuses. They noted that Colombia had specifically taken hold of this issue, was addressing the Santo Domingo incident, not just human rights in general, but the Santo Domingo incident specifically, both civilly and criminal proceedings, and then it explained how allowing this suit to go forward directly conflicted with that general policy and its specific application with respect to Colombia. Well, would it be your view that that general statement, then, would be enough in any country where they have a court system and they allow tort claims to proceed? That's basically, would that be telling the executive branch, the courts, stay out of tort law? It's not our position that, as counsel has referred to in the briefs, that the government has a veto. The court ultimately has to decide whether or not the policy is articulated by the United States and examining how maintenance of the litigation in a U.S. court would conflict with that policy is one that in the court's judgment beats the standards either set by the fourth and fifth Baker tests or under the Comity doctrine. How does it conflict? I mean, it's just a different forum. I don't see that as conflicting. Does the executive branch get to tell the courts where these claims can be brought? Well, the statement of interest identifies three different respects in which there is a conflict between the U.S. policy about where these disputes belong and the maintenance of this lawsuit. The first is that duplicative proceedings in U.S. courts second-guess the actions of the Colombian government and its military officials. So there's first the whole problem, which Sosa had identified more generally with respect to the statute, that it's very problematic to be second-guessing the actions of a foreign government against its own citizens on its own soil. The second is that there is a potential for reaching district conclusions, which may be seen as unwarranted and intrusive to the Colombian government. We would not be bound as a matter of due process by any of the findings made in the Colombian courts. All of those issues are going to have to be re-litigated if the suit goes forward. So that potential for inconsistent conclusions with respect to the same issues is a second way in which there is conflict. More like a statement of the abstention doctrine as was presented in Hilton and other cases. Is that really the fourth baker factor, lack of respect for a coordinate branch of government? I mean, obviously they say you should abstain here because it's being taken care of in the foreign country and you shouldn't second-guess them. That's bad. But is that really the fourth baker factor? I think it is the fourth baker factor for the reasons that the Whiteman court explained, which is that the government has made a determination that U.S. policy favors the use of another form for this dispute in particular and pursuant to a general policy. But I equally agree that under comity principles, which essentially are animated by the very abstention concerns you're identifying, that that's equally applicable. And again, if you see the debate between Whiteman and Ungro-Ganage as to which is the right box to put it in, either one is available here and appropriate. Mr. Collins, same question I put to Mr. Hoffman. Under the comity doctrine, do you have to find a conflict in laws between American law and foreign law? No. As we explained in our cross-appeal reply at some length, the Hartford Fire case arose in the context of whether or not comity would be invoked to limit what was concededly the extraterritorial application of the antitrust laws. And it arose in the context of this court's Timberlane multi-factor test as to how to analyze that. And that was how the case was postured. And the court specifically said that it was not addressing how comity would apply in other contexts. Justice Scalia, in his separate opinion, noted the doctrine of comity of courts, essentially the sort of extension that we're talking about here is being a different situation. So it's not a case where the sort of Hartford Fire conflict is required. Do you have a conflict there? Well, we have a conflict with policy, but the Hartford Fire- In terms of, you indicated earlier that you wouldn't be, you would be arguing you weren't bound by anything that happened in Columbia. Sounds like a good argument. So what's the conflict if claims against your client are pursued in the federal court in California? The conflict is, as identified in the statement of interest, it's the second guessing of the actions of Columbians. What second guessing would there be if you're not bound by anything that happened there? Then they're going to review the very same issues, potentially reach disparate conclusions. And the third extent to which there's a conflict is that it may be perceived that the U.S. government does not recognize the legitimacy of Columbian judicial institutions. So there certainly is a conflict with the U.S.'s policy in terms of where this belongs. And on the issue of comity in particular, the only reason, if you look at Judge Ray's comity analysis, he acknowledged the Hartford Fire standard, but then he also acknowledged that Ungaro-Bonagas was dealing with comity in a different context. And then he addressed the Ungaro-Bonagas test. And the only reason why he rejected it was his erroneous conclusion that the double recovery rule rendered Columbian adequate form, a conclusion that, as Judge Wu noted, the plaintiffs did not defend on remand and apparently agreed was incorrect, and that Judge Wu then proceeded to reject and then also rejected and made contrary findings to what Judge Ray had made with respect to the issue of safety. Now, Judge Ray, he mentioned the safety concern, but he treated it as a factor in the public-private balancing analysis and the forum nonconvenience. He actually did not hold that it was an inadequate form because it had been shown to be so dangerous. But Judge Wu rejected that conclusion and found that the evidence was inconsistent with the claims of danger and that the forum was not unavailable. And also he pointed to the Ardetta case, which said that if you don't need to go down to the forum, then danger is not going to render it inadequate and that that was the case here. So given his conclusion with respect to the adequacy of the forum, the sole basis for the district court's original rejection, Judge Ray's rejection, of the Comity Doctrine just was completely vitiated, and therefore I think based on the record before the court, the court could easily affirm Judge Ray's original ruling under the Comity Doctrine of Ungaro-Badanges. I'd like also to address the issue of Kiobel. As an initial matter, the plaintiff's position that somehow the presumption against extraterritorial application gets set aside if there's a touching and concerning, and therefore we sort of get out of that analysis, is I think refuted by the Kiobel opinion itself because the sentence that has the touch and concern language on page 1669 of the opinion, the site after that sentence is Morrison. And Morrison then, if you turn to the relevant and cited section of Morrison, talks about, well, to announce the presumption is not necessarily to resolve the issue because sometimes it is a question and requires further analysis to determine how it applies in the particular case. Here, the case is simple because Kiobel and Sosa identified what is the focus of the Alien Tort Statute, and that's the Morrison analysis. What is the focus? And the focus is on the violation of the law of nations, and here the predicate violation of the law of nations occurred overseas. Wasn't that the very purpose of enacting the ATS was to authorize federal courts to hear actions where an alien sues a U.S. citizen? I mean, that's the fundamental reason that Congress enacted the statute. With respect to... And your client happens to be a United States domestic corporation. Why isn't jurisdiction proper? Because the historical examples that the court identifies in Kiobel both involved incidents that occurred in the United States. There was an assault on the French ambassador in Philadelphia, and then there was also an unlawful entry into an ambassadorial residence in New York City. So the Kiobel court held that there was no indication... If you're right, the question I asked Mr. Hoffman, then doesn't that mean that Philardega is wrong? Well, Philardega at this point is covered by the TVPA on its facts. Well, that's a clever answer, but it doesn't really address my question. I didn't think it was doing so at the time. Philardega is wrongly decided under Kiobel. Now, Justice Kennedy does note the TVPA covering those kinds of situations. He doesn't mention Philardega by name, but he notes that that situation is now covered by the TVPA, and he says there will be other cases not covered by the TVPA and not covered by the court's analysis. But the TVPA now covers the situation addressed in Philardega. But no, Philardega involved conduct that entirely occurred overseas, and so there's no basis consistent with Kiobel to say that it would apply here. The D.C. Circuit in Doe versus Exxon in 2011 quoted from Blackstone and, you know, talked about the basic common law in civilized nations. If you have a tort that occurs somewhere else committed by a citizen of your country, I mean, it's just common sense that you have to be able to find redress by suing that citizen in the jurisdiction where that person is a citizen or a corporation. So you're suggesting that torture, wrongful death that occurs elsewhere by a corporation or a United States citizen can't be redressed in the courts of this country. Is that your position? The question under our position is that the TVPA provides an extraterritorial remedy it concededly does not apply to corporations. The ATS does not provide a remedy for overseas conduct. It is not a question of whether or not Congress has the power. Of course it has the power, consistent with international law, to extend remedies to Americans overseas. The question is whether or not it has exercised that power. And Kiobel holds that it has not. It has not sought to provide a remedy under the Alien Tort Statute with respect to conduct and violations of international law that occur overseas. And that's true whether or not you look at it as we think you should within the context of the underlying predicate act. Because again, Kiobel emphasizes the concern in SOSA about extending the law at issue in the ATS in this sort of context, this very context where you're talking about the actions of a foreign government against its own citizens on its own soil as presenting great concerns that animate its holding against extraterritorial application. I agree that Kiobel doesn't answer this precise question. It did not have it on the facts. Correct. It was a foreign case. Four justices said clearly that being a United States citizen would be enough. It's correct that four of them said that. But they said that pursuant to an analysis that was inconsistent with the court's analysis, as they acknowledge. And Kiobel, right after this touching concern language, cites Morrison, which talks about it's too craven to say corporate presence would be enough. And they say, corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices. And if Congress were to determine otherwise, a statute more specific than the ATS would be required. I'm having trouble interpreting that to mean anything other than being a corporation in the United States alone is not enough for jurisdiction if all the relevant conduct was somewhere else. Is there another way to interpret that? No. I think Your Honor is correct, and that's how the Second Circuit in Balintulo read this. Red Kiobel is saying that if the conduct is overseas, mere corporate citizenship is no different than corporate presence and doesn't change the analysis. If the conduct occurred overseas, it's still extraterritorial. And the citation to Morrison confirms that, because it says look at what the focus of the statute is. And the focus of the statute is in no sense the corporate citizenship. There's nothing in the Alien Tort Statute that suggests that the corporate citizenship of the defendant is somehow the focus of concern there. The focus of concern is with providing a remedy with respect to international law violations that occur on American soil. That is what the court in Kiobel said the history showed. And here, with all of the conduct occurring overseas, it is within the Kiobel presumption, and it's not rebutted. And the plaintiff cited this court's opinion in the Chow-Fan-Hsu case. I actually think that that case supports the finding under Kiobel that it's impermissibly extraterritorial. If you look at page 979 of that opinion, it again uses the Morrison focus analysis and identifies what's the focus of RICO. And the focus of RICO, according to the court, is on the pattern of racketeering activity. And so under Morrison, we look not upon the place where the deception originated, but instead upon the connection of the challenge conduct to the proscription in the statute. So how does the conduct at issue fit into the proscription of the statute? That tells you to be looking where the violation occurred, here the violation occurred overseas, so we're clearly within the Kiobel presumption. And leave to amend should not be granted for several reasons. First, counsel essentially admitted he doesn't have facts consistent with Iqbal to plead in order to satisfy. Did you originally move under Iqbal? I know this whole issue has kind of developed in the last ten years, but was there a motion that addressed that subject originally that's on appeal here? I do not believe that my original motion to dismiss in August of 2004 had the foresight to specifically identify the Kiobel issue that has now been fully briefed. In the unlikely event that this panel were to say that you couldn't bring it unless you allege more facts, shouldn't we give the plaintiff an opportunity to say? I think there's several reasons here why not to. First, he has essentially said that absent discovery, he can't come up with more facts in order to plead that there was conduct in the United States that violated the Alien Tort Statute or that violated, constituted an international law violation for purposes of the Alien Tort Statute. But as the Iqbal decision makes very clear, the pleading standards there are the key to getting to discovery, so you don't get the discovery in order to then plead the Iqbal standards. Iqbal says exactly the opposite is true, so you can't get discovery in order to state a valid complaint under Iqbal. Second, we know from the motion to stay that was made in this court and the concession that this case is based on conduct occurring overseas. Third, we sort of have a little bit of an odd posture here, because normally when you come up on a motion to dismiss, you don't have any other record about the facts. But here we come up from two motions. There's a 12B6, but then there's a separate motion under 4 nonconvenience, which had a little bit more of a factual record. And that factual record, and I'm pointing particularly to the declaration of an Occidental Columbia employee at page 610 of the supplemental excerpts, makes clear that what we're really talking about here is a subsidiary, Occidental Day Columbia. That's the relevant entity here. They sued the wrong entity for purposes of 12B6. I'm bound by the false allegations that the contracts are with Occidental, the parent publicly traded corporation. They're not. But it's relevant when you consider the question of leave to amend. How do we know that it's not? I mean, is it in the record? It's in the record from the 4 nonconvenience. But in terms of whether or not there's good faith for leave to amend, the suggestion that because Occidental Petroleum Corporation, a publicly traded entity at the top, is located in Los Angeles, that that gives some basis beyond sheer speculation that there's activity in the U.S. In fact, it's a subsidiary headquartered in Columbia, which renders purely speculation that they have any basis for alleging anything in the United States to meet the killable standard. And then fourth, there's an interplay between the substantive ATS requirements and the ability to meet the killable test. Because as we pointed out in some of the supplemental 28J letters on the recent authority, the specific direction requirement for Actus Reis, which we think that under SOSA has to be the standard. It's the strictest of the standards applied by the various tribunals who've analyzed the aiding and abetting issue. The specific direction requirement requires that there be a very close causal nexus between the act that's alleged to have aided and abetted a violation of international law and the specific violation. Any behavior that could possibly meet the specific direction with respect to a single incident, and they emphasize over and over in their briefs that this is about a single incident that took place on December 13th, 1998 in Santo Domingo, Colombia. Anything that's going to meet that is going to be in Columbia. And so that makes it futile to think that anything they could plead that would satisfy the substantive standards of the ATS could involve conduct that occurred in the United States. So for all those reasons, they don't meet the killable standard and there's no basis for thinking that a remand is appropriate. At this case, this court should deny, leave to amend, and apply killable and end this case at this point. Then with respect to the state law, with respect to the state law claims, the district court correctly applied the Foreign Affairs Doctrine because it found a specific conflict between U.S. foreign policy with respect to where these claims should be adjudicated. And the notion that California law would be applied in a California federal district court to resolve the issues of the liability of a foreign sovereign. But I assume you do have a conflict of law battle ahead of you if we were to return this to the district court. On two levels. Now, yes, in terms of Colombian law versus California law. Curiously, the complaint in this case had never sought to rely on Colombian law. The choices it gave for the Alien Tort Statute and California law seemed pointedly to omit reference to Colombian law. Isn't that your obligation as a defendant to raise the conflict of law if you don't like the foreign law? No. We took the motion to dismiss at face value. It took the complaint at face value. Excuse me. They alleged reliance on federal law and state law. So those were the grounds I attacked and I attacked them on particular objections. That doesn't waive later objections that may be raised down the road. But one issue which we have raised, apart from, you know, when you get into a substantive choice of law analysis as between California law and Colombian law, is whether or not there could be a, from an ERIE point of view, whether or not there is federal common law versus state common law. Because part of the whole rationale of SOSA was that the court held that ERIE did not oust federal common law in this area as it had in other areas. And that's why the common law authority that it had attributed and thought was reflected in the enactment of the ATS survived the evulsive shift of ERIE and still existed. But that means, consistent with SOSA, that federal common law is the whole game here. And if the SOSA standards are not met, then from an ERIE point of view, we're done. There isn't a role for state law. Why is that? Why wouldn't the federal court have supplemental jurisdiction over a state law claim assuming that the choice of law argument doesn't defeat that? I mean, this is not an ATS action. The jurisdiction would be we have whatever the basis is of our federal jurisdiction and then there are some supplemental state law claims. But you have an initial question from an ERIE point of view as to whether or not it is an area that would be governed by federal common law because of uniquely federal interests versus an area in which state law could have any play at all. And that's sort of a separate choice of law analysis from the analysis between California law and Colombian law. And SOSA, because it says that ERIE did not oust federal common law and recognizes that there are obviously hugely important federal interests at stake here, the area would be governed, if at all, by federal common law and not by California law. It is an argument that we have raised in the alternative. Is there a case that supports that? We have many cases that have a federal cause of action and then we'll also look at the state law. I guess if Occidental had violated California law in California, I don't see why we couldn't look at it. But the point is that when you're talking about this kind of situation of foreign law being applied on foreign soil involving foreign government's acts against its own citizens, that's an area in which if any common law is going to be applied, it would be U.S. law. But that was an alternative argument that I made in my brief in the alternative to our main argument, which is the Foreign Affairs Doctrine, which relies on the direct conflict between federal policy and the application of California common law here. And the district court correctly recognized that there was a direct conflict here and that therefore, under the Foreign Affairs Doctrine, California law could not be applied. And the notion that there has to be, as the plaintiffs claim, an actual legally operative agreement or a policy is, again, inconsistent with the Second Circuit's decision in the Ossie-Corazione case, which pointed out there was no agreement covering the Italian entities. There was no agreement with Italy. It was purely a policy. It was the policy that was reflected in the various agreements with other countries, but it was a policy about where these claims belonged. It was implemented in specific agreements, but there happened not to be a policy or, excuse me, a specific treaty or agreement that covered the Italian entities or with Italy. And nonetheless, the court held that the Foreign Affairs Doctrine did apply to bar those claims. Well, but do we really have a policy here? I mean, the statement of interest talks in terms of the State Department believes the case will have an adverse impact. That's certainly not a policy. And they then refer to the important policy of foreign courts being able to handle potential consequences. I mean, those don't seem like the kind of policy that would require the court to advocate essentially their jurisdictional powers in favor of the executive branch. But it clearly states two different policies. Well, what other policies you think are so ingrained and stated in the statement of interest that would preclude the jurisdiction? The first is, as stated on page 410 of the excerpts, an important part of our foreign policy is to encourage other countries to establish responsible legal mechanisms for addressing and resolving human rights abuses. That was a policy that, again, in the amicus brief that would help. Well, would that policy be enough? I mean, you could say that's the policy of the government, our government throughout. So wouldn't that just essentially trump all tort claims in state court if the government wished to write this kind of letter? But again, it's not the government. This is not an exercise in ad hoc. The government identified a specific policy that transcends the case. And then it articulated why in the context of Colombia generally and the Santo Domingo incident in particular, that policy was relevant here and was inconsistent with maintenance of the suit here. The statement of interest also identifies a second policy, which was, again, also articulated and expounded upon in the amicus brief, which is the U.S.'s policy of promoting engagement with regimes which sometimes have spotty human rights records. And it is not U.S. policy to create situations where the maintenance of suits will essentially create a sort of judicial divestment and discourage foreign investment. And that's specifically identified also in the statement of interest as a second policy that's implicated in a conflict here, because it identifies and says lawsuits such as the one before Judge Ray have the potential for deterring present and future U.S. investment in Colombia and identifies that if that kind of sort of anti-engagement approach is followed, the consequences that will have for the stability of the Colombian regime and of the region and the importance of Colombia in promoting U.S. interests in the hemisphere. So there's a direct conflict between maintenance of the suit here and the reliance on California law and the U.S. policy as articulated in the statement of interest. I'd also like to address the issue that was raised about the timeliness of the notice of appeal, which also is a jurisdictional issue. When this court previously had the case, it did not retain jurisdiction over the case. It issued its mandate, which is the formal act by which the court relinquishes its jurisdiction and returns the case to the district court. Having issued the mandate, and the mandate, by contrast, was not issued in the Sarai case, or actually it was issued, but then was promptly recalled as having been erroneously issued and then was held. And when Sarai was then reactivated, it proceeded under both CA numbers. It was a belt and suspender second notice of appeal that was done timely. And then the case proceeded there. Here there was a relinquishment of the jurisdiction by the issuance of the mandate. That's an important act. The district court reacquired jurisdiction. It resolved the issues that were before it. At that point, there needed to be a fresh invocation of appellate jurisdiction. So are you saying that the remand was not a limited remand, it was a full remand to the district court? It was limited in the sense that the scope of the substantive instructions in the mandate are always binding on the district court, and they were relatively specific as to what the district court was to do. How did we resolve the issues on appeal before us? Because we don't have the authority to ignore claims that are before us. There's less work for us. So we must have resolved. If what you're saying is we issued a final order, we must have resolved all those issues and remanded it based on one issue to the district court. So how did we resolve those issues? The court did not resolve the issues. So implicitly, we reversed, correct? Well, what the court did, and I think this gets into the debate that Your Honor had with Judge McEwen and her response in footnote one of the first Sarai opinion, which was, you know, how can you send it back for exhaustion unless you've overturned the political question ruling? Because there had been a similar political question ruling in Sarai, and Your Honor had dissented and objected on that point. The plurality's response, among others, the plurality's response on that point was to say that this was an instance in which there was a choice among threshold issues. So political question being a threshold issue, being a jurisdictional issue, and prudential exhaustion not being jurisdictional, but being a threshold issue that could be done ahead of jurisdiction. And the plurality held that under the circumstances of the case, prudential exhaustion should have been considered first. And so the remand was essentially similar to that, saying that this was a situation in which prudential exhaustion should have been considered or certainly were inviting the district court to consider that issue. The district court then declined to apply prudential exhaustion, did not then decide to vacate the prior judgment and substitute it with a judgment based on exhaustion. And therefore, having denied that, left in place the prior judgment, which as the district court noted on page four of its opinion, and all of us agreed below, had not set aside the prior judgment. That left the prior judgment in effect. At that point, there needed to be a fresh invocation of jurisdiction by a timely notice of appeal by a party with Article III standing to file it. It would have been nice if all of us had marched in straight lines. We didn't march in very straight lines on this one. What's curious about this is that the district court titled its order an order on, what was it, a ruling on limited remand as to the prudential exhaustion issue. So the district court seemed to perceive that it had only limited jurisdiction, and I believe that Occidental's own filing in that case was styled a limited, unlimited remand. Correct. We all recognized that, as I said, the scope of what the mandate allowed the district court to do was constrained. There was no dispute about that. The only question is having moved from this court to the district court with the issuance of a mandate and the relinquishment of jurisdiction, did there need to be a fresh invocation of the jurisdiction? And there did. And the Richmond case that they cite … If there's a limited remand, you wouldn't need a fresh invocation, would you? You wouldn't if, as in Sarai, this court retained its jurisdiction and then remanded. I was interested to see that your notice of appeal specifically indicates that the order of remand was entered as a result of a limited remand. Correct. We're all agreeing that it was a limited remand and it had a very narrow mission for the district judge, isn't that right? Correct. And all of the other issues, many of which we're talking about today, have not been resolved by this court. So why is it that the appellant previously filed timely notices of appeal? What happened to those timely notices of appeal? Did they just go out the window? Well, it's the issuance of the mandate is a relinquishment of jurisdiction. I looked into this mandate issue for my own purposes where I was hoping to find something pretty specific that the mandate has some jurisdictional consequences. But the best I could find is it's pretty much an administrative act because we recall the mandate, it's issued in error, we bring it back, we do a bunch of things after the mandate issues. We hardly ever pay attention to that. So I sort of haven't found anything suggesting that the mandate really affects our Article III type jurisdiction. Maybe you could suggest something. Could we recall the mandate now? I don't think you could consistent with the constraints the Supreme Court has placed on when a mandate can be recalled. But, you know, we had cited in our brief, I believe we cited a case noting that the issuance of the mandate is something that has jurisdictional significance. Yes, on page 4 in footnote 3, we indicated that that normally signifies that the court... and that they can then proceed. So it's convenient in our case because we have petition for re-hearing and re-hearing en banc. And after an opinion is filed, there's often a lot of activity in our court. But I haven't seen a case other than, you know, Thompson v. Calderon said we don't recall the mandate except in exceptional circumstances. But we can still recall it if we determine it's exceptional circumstances. But I haven't seen anything saying that issuance of a mandate actually cuts off our jurisdiction. It doesn't in the sense that you're right, that there's residual power, at least consistent with the significant constraints of Calderon. So let me ask you, just I want to understand your position. Your position is that the... If you are correct that the appellant has failed to timely appeal, what issues still remain that we would decide? If the notice of appeal was timely, then the case is over because the judgment then was not timely appealed from. The judgment that was left in place was a dismissal with prejudice. I recognize it's a difficult issue. And in our brief, we noticed there was a circuit split over the issue of whether or not there was a problem. But it's a jurisdictional issue and it's our obligation to raise a significant jurisdictional concern with the court. But certainly if you, you know, if you find that either the notice of appeal was timely or was valid under the Sixth Circuit opinion, which was written by Judge Wallace in my designation, or that the court can recall the mandate, then you have the range of issues before you and either the political question and comedy grounds are dispositive of all of the issues or the killable issue and the foreign affairs doctrine are also independently dispositive of all of the issues for all of the reasons that I previously outlined. But if the appellant's notice was not timely, then... I think that would mean the case... We would have to just enter a very short order saying we don't have jurisdiction? Correct. I think that would be the consequence of it. You know, I recognize the difficult issues that lead up to that, but I think on the other side of it, if that is the consequence, if the notice of appeal was untimely, then I think that is the consequence. Half the force would be your conditional appeal and their cross-appeal of that question, but that would be limited to Judge Wu's order, which would be irrelevant at this point, so it would be moot. Correct, because we were very clear that we... We were clear both when we got back before Judge Wu and in the notice of appeal, which was a bit of a speaking notice of appeal, that we preferred to have the original judgment. We did not want to have it substituted with an exhaustion judgment if that... We'd rather have the judgment of dismissal with prejudice that we had from 2005. However, if that was set aside, rather than have the case proceed, we would then conditionally then appeal the exhaustion conclusion and then at that point would go forward, you know, with having a judgment of dismissal. In favour of a Columbian forum, that would be... And for exhaustion of remedies, and that, of course, would be without prejudice through renewal, depending upon how the Columbian proceedings were resolved. With respect to the issue of exhaustion, the Judge Wu correctly found that there was an adequate alternative forum in Columbia. Obviously, that was within the scope of this remand for the reasons we've explained in the brief. The whole remand was futile if the issue of adequacy of the forum was not reopened for Judge Wu to decide. And obviously, the fact that he was also told to consider the significance of Columbian proceedings. The Columbian proceedings were only relevant to the issue of whether Columbia had adequate judicial institutions capable of handling and fairly resolving the issues raised by the Santo Domingo Institute. Our panel already cited the civil case and settlement and the criminal case. Correct. Correct. There had been a round of supplemental briefing as to the significance of those events. And part of our briefing was to argue that they illustrated the adequacy of Columbian proceedings. And in their supplemental briefing, and we pointed this out in the cross-appeal reply, the plaintiffs had argued that the court should not remand because it was futile, because Columbia was mad about it. I'm looking at page 10 of Judge Wu's order. And I'm looking at his conclusion where he says, If, therefore, this court would conclude that Occidental has not shown that those claims against defendants in this case are likely to be subject to an exhaustion requirement, why go on to the next step? Why go on to the availability of local remedies? Isn't that all dicta at that point? Why didn't he just stop? It's interesting, but why didn't he just stop? He went on because he had been told to do two things. He had been told to decide whether or not, as a matter of discretion, he would choose to impose a prudential exhaustion requirement under the standards this court articulated in Sarai 1, and then to consider the effect of these decisions. So I think he felt it was consistent with the court's mandate, and indeed the plaintiffs even said so in their brief, that he then proceed to address... He's sort of doing it in the alternative? I think he is. In case the court disagrees with me, here's something else for you to think about? I think he wanted, and it was frankly a wise... He needed something else to think about? Well, it was a wise exercise, frankly, of judicial resources, particularly in cases... Of course, the problem with it is that he's disagreeing with Judge Ray, which raises interesting questions about the law of the case doctrine, and so it may just sow additional confusion here. I think it was a wise exercise of judicial resources in the sense that, particularly given the case has gone on so long, he was given this set of issues to re-examine. He was going to give your honors the benefit of his conclusions on every one of those issues, so that if you disagreed with point A, it didn't require another remand to go back to the next issue. He set all of the issues out, and that frankly seemed to be consistent with what the mandate had told him to do, which was to consider the effect of the Colombian legal decisions on the case, and he proceeded. He didn't ultimately find that they were that particularly informative, but he did, in the context of resolving all of the issues about exhaustion, go through all of the issues that Sarai had raised, and Sarai, one of the issues it discussed is the adequacy and availability of alternatives, so it was consistent with the remand to reconsider in light of Sarai to walk through all of those issues, and that's what he did. And it obviously, because this court gave him the authority and the discretion to revisit the issue of the adequacy of the Colombian form, it obviously was within his power then, notwithstanding law of the case, because this court, when it tells a district court or gives the district court power to revisit an issue, it may then revisit the issue and reach a contrary conclusion from the prior judge, or even if he had been the original judge in the case, he could change his mind in light of that. So once you find that the form is adequate, then the question is whether he was correct, the last question is whether or not he was correct in his analysis of Sarai, and we submit that his analysis of Sarai was too narrow. He focused only on two factors. He treated them as a per se requirement, and frankly his analysis, when you put Sosa together with Kiobel, would essentially wipe out any role for exhaustion in alien tort cases, because if having anything other than a weak nexus, and having, or having, because they treat it as alternatives, or having a universally recognized norm is something that takes you out of exhaustion, then you're out of exhaustion in every alien tort case, because you have to have both of those elements to have an alien tort case. Consistent with Kiobel, you can't have a weak nexus to the United States. Consistent with Sosa, you can't do anything other than rely on a universally accepted norm. That's well defined. And in those circumstances, there's no role, if you limit it in that way. But that's not the correct reading of the Sarai opinion, because it focuses on a number of other concerns, comedy factors. Could you just, before you go on discussing Sarai, can you just remind me, what is the precedential effect? It was a very fractured opinion. There was three judges who agreed in this expression of the prudential exhaustion, and what is, is there, were there other judges agreeing in the expression of it, or just in the results? You're correct, Your Honor. I skipped over a point, which is both sides in their, in their briefing post-Sarai, have recognized that with the Supreme Court's vacature of the ultimate opinion in Sarai 2, and then this Court's entry of a simple one-paragraph order dismissing the case without providing the reasonings, all of the issues that were resolved there are essentially reopened, and the opinions that were previously entered have no binding precedential force. They have persuasive value for whatever persuasive value they have, but they don't operate as binding precedent having been vacated ultimately by the Supreme Court. And in Sarai 1, my recollection is that there was not a majority opinion of the en banc panel. Is that correct? That's correct. It was sort of a Marx majority, I think they call it, between the discretionary prudential exhaustion position of the plurality, and then of Judge Bayer. Three judges, right? Excuse me? I think the plurality was three judges. That's correct. And then of, I believe it was, it may have been three more, I don't have the number off the top of my head, who joined Judge Bayer's opinion, but it was essentially Judge McEwen's and Judge Bayer's opinion. And I think, excuse me, that Judge Kleinfeld actually supplied the sixth vote. It may have been 3-2, and then Judge Kleinfeld won, saying in order to have some disposition, I will join. We do have a footnote from, in Judge McEwen's opinion, footnote 10, suggesting under Marx that there are six judges, Correct. Correct. On the exhaustion question. That's right. That's right. So, you know, there was- We have a result, but no rationale? Is that- Well, I think ultimately when the Supreme Court then vacates the whole judgment and then the en banc court doesn't readopt that analysis, I do think the issues are sort of left open. And that was the position both parties took in their brief, for example, with respect to the substantive alien tort issues that had been resolved in Sarai 1, because quite a number of them, excuse me, in Sarai 2, because quite a number of them had been. All of those are then reopened, given that when it went back from the Supreme Court to the en banc court, the en banc court did not reenter and rearticulate holdings on specific issues that then would become a binding precedent. But nonetheless, either viewed within the lens of a priority opinion in Sarai 1 or viewed ab initio, we think that the exhaustion analysis can't be limited in that way to two per se factors which really just restate the threshold requirements for getting into the alien tort statute in the first place. It has to be the case that a significant factor in the exhaustion analysis would be the avoidance of conflict with a foreign government. The very sort of conflict that's identified in SOSA with respect to extending the alien tort statute to a situation where a foreign government's actions against its own citizens, its own soil, is the subject of the claim. That presents the core issues that require great caution. That has to be a central factor in the exhaustion analysis. But isn't your argument about, wouldn't your argument of Kiobel sort of moot all of this? There's no requirement for exhaustion in a case such as this because your argument under Kiobel is that there's no jurisdiction whatsoever. Correct. I mean, it's opposition both that they don't meet either of the threshold requirements. They don't meet the requirements of Kiobel with respect to extraterritoriality and they don't meet the requirements of SOSA with respect to, you know, the norms in the case. But if the court were to conclude otherwise or were designed to choose to reach the exhaustion issue first, then it has to be the case that the exhaustion analysis would not exclude from its consideration the core animating concern that motivates the caution that the Supreme Court articulated in SOSA, which is the potential for disruption in foreign relations. It has to be that that's a significant factor in a prudential determination whether or not exhaustion should be required. And the overly constrictive approach that the district court applied here was legally erroneous on the question of exhaustion. And indeed, we think that there's only one way that the exhaustion issue could be resolved. This is the poster child for exhaustion. When the very same plaintiffs have litigated the very same claims to a successful judgment and conclusion in the foreign country and failed to take advantage of an opportunity to bring a suit against Occidental in that foreign country, that's a paradigmatic case for exhaustion of remedies. This is, as I said, the poster child. Now, they said that they couldn't add us, but the foreign law declaration submitted by Dr. within this special court system that claims against the government are brought in. They do have pending jurisdiction against other parties when the claims are related. That was an issue which their foreign law expert disputed. But that was something that and he, our foreign law expert, gave a rebuttal declaration that explains why as a matter of Colombian law, that's possible. But, of course, that goes to the question, they could litigate, you know, if the court would have imposed a prudential exhaustion requirement, then a Colombian court would have to decide what would be the vehicle, what would be the significance of the prior judgment and whether the rule against government recovery barred it. All of those issues. Has Occidental waived objections to jurisdiction in Colombia? Occidental Petroleum Corporation, apparently, has consented to jurisdiction in Colombia for purposes of this case. We've also indicated in our cross-appeal reply brief that we would similarly be willing to waive as to Occidental Petroleum Corporation, the entity sued here, the statute of limitations, which apparently due to the length of the proceedings in the U.S. has now lapsed. Our foreign law declaration. I noticed you were very careful to say this to Occidental Petroleum. Of course, we have the problem that you think that they sued the wrong entity. Which is their, that's their problem. They've known that for a very long time. If it was shown in Colombian courts to be that the appropriate entity had to be Occidental Petroleum of Colombia, then there may be problems which you're not waiving at this point. Well, we're not waiving the fact that they sued an entity that did not have connections to the conduct in question. That's a substantive, that's a substantive defense. They've alleged that Occidental Petroleum Corporation, the parent corporation, did all of these things. Of course, it did none of these things. And that's not a defense that we are waiving or should waive. It's normally not a condition of either a foreign nonconvenience, exhaustion, or any other dismissal that you waive a defense that would be available here. And that would certainly be available to us here, that they sued the wrong entity. So, unless the court has any further questions, prepare to submit. Thank you. Mr. Hoffman? Let's put five minutes on the clock, Will.  We've covered a lot of territory. I think so. I think so. I'm trying not to repeat. Just on the last point, I think it's the poster child for why no exhaustion should be required. Under international law, when you have danger of the sort that we've presented in this record, that's exactly the kind of case when exhaustion is not required under international law because of futility and danger. And the fact that there was this other proceeding is exactly what, the fact that he spoke out and they filed the case, the first case, is exactly why they started suffering death threats and his colleague, who was a fellow victim, got assassinated, and why they're living in exile in Canada. So, the idea that they could go back to Colombia and litigate this case is farcical. They can't set foot in Colombia, and they have no intention of setting foot in Colombia. And they've got, according to our expert, they have to go to Colombia to litigate this case. They can file it, but they have to give their testimony in front of the judge. And the other evidence is evidence of danger to witnesses, danger to any lawyer that would take the case against this corporation. And Judge Ray found that they could not safely go back to Colombia. A posting counsel says that Judge Ray decided on the double recovery bar issue, not on the safety issue. Well, he decided the adequacy issue. What he said basically was, given the double recovery issue, it's not an adequate forum. Now I'll go to the public and private factors, and I'll consider the safety issue under the private factors. And, of course, he also balanced the balance of private and public factors is enough to warrant affirming him on forum nine, no matter what the decision is on adequacy. I mean, he didn't abuse his discretion in deciding that these factors favored the plaintiffs and favored allowing us to proceed in this jurisdiction. The fact that he may have been wrong on double recovery, that's just one part of the equation. All the rest of it was fine. And, in fact, it's even better for us now because of the accession of Colombia to the Hague Convention, so their argument that they can't get witnesses here is just wrong. So this is not a case where exhaustion is appropriate. And danger, this is a real thing. Someone was killed in this man's house as a result of their advocacy about this. Colombia is not the United States, and there's real dangers there. And we had a tremendous record about that, the kind of record that has caused, in many ATS cases, courts not even to think twice about whether you could send people back to places like that. And so I think that that's, on that issue, this is not a case where exhaustion should be required. I don't know what the current state of the law is in the circuit on exhaustion. We think, we thought it was the way that Judge Wu and Judge Morrow interpreted Sarai. But also note that there aren't any other circuits that require exhaustion. I mean, in general, exhaustion hasn't been required under the ATS generally. The Supreme Court hasn't decided itself whether exhaustion should be required. They said they would consider it. Instead, they came up with Kiobel and Sosa, and it seems to me that deals with all these issues without requiring exhaustion because it deals with the same kinds of issues. I would say on Kiobel that there is a difference between corporate presence and corporate citizenship. And this is an answer to your question, Judge Okuda. The mere corporate presence issue was the fact that the basis for suit in Kiobel was that Shell had an investor office in New York, you know, for which it paid somebody $120,000 a year or something like that, and the court found that there was general jurisdiction. That's what they were referring to. It was the fact that multinational corporations that are not U.S. corporations have presence all over the place. Most of them have presence in the United States. And I think that the Baumann decision recently is another example of the court putting restrictions on the circumstances in which foreign corporations or their subsidiaries can be sued here, not just for human rights violations but for other violations, too. But U.S. corporations are different. I mean, they're different in the sense that they're not only here. They're not just mere presence. This is where they live. This is where you can sue them. This is where they're given the possibility of existing and doing things and causing harms. And there's a tremendous interest that California and the United States have in holding their corporations accountable. There's nothing in Colombia that was holding these corporations accountable. Those proceedings were against the government. The criminal proceedings were against the Colombian Air Force people that were found to have acted ultra vires. Those weren't government acts, ultimately. They were the acts of criminals. And the question is whether these defendants either are allegations or they directly participated in this war crime and also that they aided and abetted the war crime. And the three U.S. employees of AirScan, I mean, they were never brought to justice in Colombia. It's not even clear they can be. They're U.S. citizens. And, you know, the Kiobel decision is based also on our responsibility as a country to live up to international law. I mean, that's really what is at the heart of it. And that's why Bradford said what he said. Bradford said, look, if American citizens are engaged in a violation of the law of nations, albeit on the coast of Africa, you can still sue them under the Alien Tort Statute. And the truth is this idea of preemption under Erie is a very strange proposition because the states were the ones that enforced international law before the Constitution. When the Continental Congress couldn't do anything about the Marbois incident, it was Attorney General Bradford, then a prosecutor in Pennsylvania, who tried the person that attacked Marbois. And he tried him under international law, and they tried him in the state courts of Pennsylvania. And so before we became the United States, and ever since we've been the United States, state courts have had a role in not only enforcing international law, but enforcing torts. And the transitory tort doctrine, which is discussed a little bit in the Kiobel decision, I mean, that's been around since before the republic. It has always been the case that our courts have been open, as Justice Stevens said in the Rizal opinion, to non-citizens coming into our country and seeking redress in our judicial system. And so the idea that that could be preempted in some way by any decisions with respect to the APS seems to me as ahistorical as one could get. And maybe finally, since, well, I have two minutes. You're over to me. I'm over to you. Just come up and give us your last point. I guess the final point that I'd make, and I could say a lot about how we could amend our complaints, but I would just say that this is a case about the accountability of U.S. corporations. We have an interest in that. California has its own interest. The United States has its interest. Under the ATS, there's an interest. And that, I think, reaches the touch-and-concern requirement, albeit it's been left opaque by the court. But this is a fundamental question. Are our courts open to people from another country to come in and be able to seek redress against our corporations? And there's no reason other than that statement of interest, which expresses very general decisions, very general policies that's been given against that. And there's just no basis not to accept jurisdiction ultimately and send people back to a place where they could be killed rather than to open our courts to sue someone, an entity whose home office is in this city. Anyway, that's it. Thank you for your time. Thank you. Thank you, Mr. Hoffman. Thank you, Mr. Collins, both for an excellent argument and a well-briefed case, a very, very difficult case. The court is adjourned. All rise. The court is adjourned. Thank you.
judges: Zilly, Bybee, Ikuta